**MONTGOMERY COUNTY MARYLAND, Appellant,**

v.

**METROMEDIA FIBER NETWORK, INC., Appellee.**

No. 04 CIV. 7978(CM)(GAY).

United States District Court, S.D. New York.

June 17, 2005.

Lawrence C. Gottlieb, Ronald R. Sussman, Kronish Lieb Weiner & Hellman, LLP, New York, NY, for Appellee.

Kenneth A. Brunetti, Miller & Van Eaton, LLP, San Francisco, CA, for Appellant.

## ORDER AND DECISION AFFIRMING DECISION OF BANKRUPTCY COURT

MCMAHON, District Judge.

Appellant Montgomery County Maryland appeals to this Court from an order and judgment of the United States Bankruptcy Court for the Southern District of New York (Hardin, B.J.), entered June 29, 2004 (313 B.R. 153), which disallowed a claim by the County because it found that an unpaid franchise fee imposed on the Appellee Debtors Metromedia Fiber Network ("MFN"), Inc. violated the Federal Telecommunications Act of 1996, 47 U.S.C. § 251, *et seq.* (the "FTA", commonly abbreviated as "TCA").

The issue before the Bankruptcy Court was whether a claim could be disallowed on the ground that it violated the FTA, in particular § 253(a). MFN challenged the fee portion of the franchise agreement between it and the County, as well as the ordinance pursuant to which the franchise agreement was entered into, on the basis that statutes' local franchise requirements, including the franchise fee, operated a prohibition on their ability to provide telecommunication services in violation of § 253(a). Significantly, MFN did not challenge the County Ordinance as a whole, but rather claimed that the Ordinance must be interpreted in a way that is consistent with the FTA to the extent that it is applied to telecommunications providers.

For the reasons set forth in the Bankruptcy decision and below, I affirm the

decision of the Bankruptcy Court disallowing the County's claims.

## I. Statement of the Facts

The facts as determined by the Bankruptcy Court are as follows:

Metromedia Fiber Network, Inc. ("MFN") is in the business of providing fiber optic infrastructure, high-bandwidth Internet connectivity, and managed Internet infrastructure for customers in the United States and Europe. MFN has constructed, maintained and operated a fiber optic network and related facilities throughout the United States. Montgomery County (the "County" or "Montgomery County"), is a home-rule county with a charter form of government. Its County Commissioners have "power to make all such rules and regulations with reference to the use of the roads, streets, avenues, lanes, alleys and bridges of the county by telephone ... companies." Laws of Maryland 1910 ("the Statute"), ch. 484, § 177H. Its Board of Commissioners has "authority to grant ... franchise for such money compensation as it shall upon inquiry determine proper ... for a period not longer than twenty-five years." *Id.* at § 177W.

In order for an applicant to receive a franchise agreement from Montgomery County to gain public right-of-way to construct, install, operate, and maintain fiber optic network facilities, the applicant is first subjected to an application process. The application process is as follows:

(1) First, the applicants must negotiate franchise agreements with the County Executive representatives.

(2) Second, the proposed franchises undergo public notice period. If there are objections to the applications, public hearings before the County Executive take place.

(3) Third, the County Executive refers the franchise applications to County Council with its recommendation either to grant or deny the franchises sought.

(4) Fourth, the applicants undertake more negotiations with the County Council. In a public hearing the County Council may refer the franchises requested to the County's Management and Fiscal Policy Committee (the "Committee").

(5) Fifth, the Committee may consider the matter in a workshop open to the public. The Committee in these workshops may demand additional information and subject applicants to further negotiations on provisions of franchise agreements already approved by the County Executive.

(6) Sixth, if the Committee is satisfied, it refers franchise agreements to the President of the Council for further public hearings in open Council.

(7) Seventh, if the full Council approves the agreements after these hearings, the applicants receive their franchises. *See* Montgomery County Code (the "Montgomery County Ordinance", or the "Ordinance"), §§ 49:11–15.

Section 49:12 of the County Ordinance provides that absent a "valid objection," the County Council "shall have authority to grant" franchises if such grant "appears to the council ... expedient and proper." Montgomery County Code, § 49:12. The Ordinance does not define or explain the phrase "expedient and proper."

The Ordinance also provides that the County Council may require whatever compensation that it deems to be "proper." *See* County Code § 49:12. There are no criteria or guidelines as to what constitutes an acceptable franchise or compensation. The Council has unlimited and undefined discretion in demanding additional information and concessions, and in granting or

denying franchises. *See* Affidavit of William H. McDonnald, Jr., dated Mar. 8, 2004 ("McDonald Aff.") ¶ 19.

On or about June 22, 1999, Metromedia Fiber Network Services, Inc. ("MFNS"), one of the Debtors, and Montgomery County entered into a franchise agreement (the "Franchise Agreement") which gave MFNS access to the public right-of-way in Montgomery County to construct, install, operate and maintain fiber optic network facilities. Under the Franchise Agreement, the Debtors are required, *inter alia,* to make a semi-annual payment of 5% of MFNS's adjusted gross revenues (the "5% Franchise Fee"). *See* the Franchise Agreement ¶ 4.2.

The Franchise Agreement also required the Debtors (1) to submit financial statements with each payment of franchise fees, "keep accurate books of account," and allow Montgomery County to inspect or audit the Debtors' books of account; (2) to pay "all reasonable expenses relating to the preparation, issuance, implementation, and administration of this agreement" up to $2,000; (3) to file a cash deposit, surety bond, or letter of credit acceptable to Montgomery County for $50,000 as security for the "faithful performance by MFN of the provisions of the Agreement and the Laws"; and (4) to keep insurance policies up to $2 million per occurrence, for general liability, automotive and personal injury. *See* the Franchise Agreement ¶¶ 4.2–4.4, 73, 91.

The Franchise Agreement expired by its terms on June 28, 2001. Until it expired, MFN paid all franchise fees owed under the Franchise Agreement. MacDonnald Aff. ¶ 5. Since the agreement expired, MFN has continued to locate its facilities in the County's right-of-way, but have not paid a franchise fee. The Debtors have continuously worked towards negotiating a new franchise agreement with Montgom-ery County without, among other things, the 5% Franchise Fee. However, MFN has been unable to do so. MacDonnald Aff. ¶ 6.

Since the expiration of the Franchise Agreement, Montgomery County has prevented the Debtors from carrying out "normal system operations and business" in Montgomery County. *See* MCER 196; Affidavit of William H. McDonnald, Jr., dated April 24, 2004 ("MacDonald Aff. II") ¶ 3. Additionally, Appellant has not issued the Debtors permits needed to relocate part of their network in the County on grounds that the Debtors have no franchise. *See* MCER 196, MacDonald Aff. II ¶ 3. The Debtor has sought additional permits so that it can do some additional construction to connect with and expand its customer base. However, Montgomery County has refused to grant the permits necessary for that construction. Mac-Donald Aff. ¶ 6; MCER 196–97, Mac-Donald Aff. II ¶ 3.

Verizon–Maryland, Inc., f/k/a Bell Atlantic–Maryland, Inc. ("Verizon"), is the incumbent provider of local exchange telecommunications service in Montgomery County. Verizon owns and runs telecommunications operations in Montgomery County and offers a greater volume of service than any of its competitors in the county. Verizon is exempt from any franchise application process or requirement, including the 5% Franchise Fee imposed by Montgomery County on all other providers of telecommunications services in the county.

## II. Procedural History

On May 20, 2002, MFNS filed for bankruptcy under Chapter 11 in bankruptcy court in the Southern District of New York. On or about October 17, 2002 and September 10, 2003, Montgomery County filed multiple claims against the Debtors,

asserting an unquantified pre-petition claim and a post-petition administrative claim in the amount of not less than $4,399.76 for the 5% Franchise Fee, "had the Franchise Agreement been in effect." The claims by Montgomery County are for "franchise fees," under the theory that the franchise agreement, when expired, proceeded on a month to month basis on the same terms and conditions. AboveNet, Inc., f/k/a Metromedia Fiber Network, Inc. ("MFN"), for itself and on behalf of the reorganized debtors[1] sought entry of an order disallowing and expunging these claims, alleging that the franchise process and requirements violated § 253 of the FTA.

In addition to claiming that the 5% Franchise Fee violated § 253, the Debtor–Appellees claim that Montgomery County's unfettered discretion in granting franchises under its ordinance also violates § 253. Appellees claim that the franchise process is unfair, unreasonable, and discriminatory since Verizon is exempt from it entirely.

MFN's attack is not on the Ordinance itself. Rather, MFN claims that because the County unlawfully applied its local right-of-way ordinance to telecommunications companies who are protected by the FTA, the franchise agreement that was entered into pursuant to the Ordinance— and specifically, the fee provision contained therein—must be invalidated. MFN notes that, although the County has entered into franchise agreements pursuant to the Ordinance with some telecommunications providers, it has not required any formal franchise agreement from the incumbent provider, Verizon. It also alleges that the franchise fee charged to MFN (and other franchisees)—but not to Verizon—violates FTA § 253, in that it is not competitively neutral or nondiscriminatory.

On April 29, 2004, the Bankruptcy Court held a hearing to consider the Claims Objection, Opposition, and Reply. The Bankruptcy Court rendered its Decision on June 22, 2004 and entered a Claims Disallowance Order on June 29, 2004 disallowing and expunging the Montgomery Claims as violative of § 253 of the Federal Telecommunications Act of 1996.

The Appellant has filed this appeal, claiming that the Bankruptcy Court erred in (1) relying on case law from the Second Circuit; (2) finding that Montgomery County's imposition of a franchise fee constituted a prohibition under § 253; and (3) disallowing and expunging Montgomery County's claims.

## III. Standard of Review

■ As explained in *Troy Savings Bank v. Travelers Motor Inn, Inc.*, 215 B.R. 485, 488–89 (N.D.N.Y.1997), the standard of review for bankruptcy appeals is set forth in Bankruptcy Rule 8013, which provides, *inter alia*, that findings of fact "shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses." Fed. R. Bankr.P. 8013. A finding is only clearly erroneous when "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Mitchell*, 966 F.2d 92, 98 (2d Cir.1992). A bankruptcy court's legal conclusions are subject to a *de novo* review by the reviewing court. *See In re Maxwell Newspapers, Inc.*, 981 F.2d 85, 89 (2d Cir.1992).

---

**1.** On August 21, 2003, the Second Amended Plan of Reorganization of the Debtors was confirmed by an order of this Court and became effective on September 8, 2003.

## IV. Second Circuit Law, Not Fourth Circuit Law, Controls

The dispute in this case involves the application and interpretation of the FTA—a federal law—as it applies to the validity of the 5% Franchise Fee imputed on MFN by Montgomery County. The Second Circuit Court of Appeals ruled on this issue in *TCG New York, Inc. v. City of White Plains,* 305 F.3d 67 (2d Cir.2002), *cert. denied,* 538 U.S. 923, 123 S.Ct. 1582, 155 L.Ed.2d 314 (2003). In the factually similar *White Plains* case, the Court of Appeals held that imposing an application process and franchise fee on new entrants to the telecommunications market, while exempting the incumbent provider from such process or the requirement to pay *any* compensation to the City, violated § 253 because it was not a competitively neutral means of regulating the City's right-of-ways. *Id.* at 81. The Second Circuit also rejected the argument that the court should consider past compensation, holding that "whether fees are competitively neutral should be determined based on future costs of providing services, not sunk costs incurred in the past, because that is the playing field on which the competition will take place." *Id.* at 79. (citing *Verizon Communications Inc. v. FCC,* 535 U.S. 467, 122 S.Ct. 1646, 152 L.Ed.2d 701 (2002) (upholding FCC regulation linking "just and reasonable" rates only to forward-looking costs)).

A district judge in Maryland, where Montgomery County lies, considered a similar challenge under § 253 and reached the same conclusion. *See Bell Atlantic–Maryland, Inc. v. Prince George's County, Maryland,* 49 F.Supp.2d 805, 814 (D.Md. 1999) (*Prince George I*). The district judge also found that the 3% Franchise Fee charged by the County was not "fair and reasonable" and thus violated § 253. *Id.* at 818–19. The Fourth Circuit vacated that decision because the district court erred in deciding the FTA claim before considering state law questions upon which the case might have been disposed. *Bell Atlantic Maryland, Inc. v. Prince George's County, Maryland,* 212 F.3d 863, 865–66 (4th Cir.2000) (*Prince George II* ).

■ Appellant argues that the Fourth Circuit has taken a position on the merits of this question that differs from the Second Circuit's. Appellant also contends that the Fourth Circuit has a greater interest in the outcome of this case under a traditional conflicts of law "interest analysis," because Montgomery County is located in the Fourth Circuit. Therefore, it argues, the Bankruptcy Court should have followed Fourth Circuit rather than Second Circuit law.

First, the argument is absurd as a matter of fact. There is no conflict between the Second and Fourth Circuit decisions on the merits. In fact, there is no Fourth Circuit law on the precise question that was before the Bankruptcy Court. The Fourth Circuit declined to review the merits of the FTA claim in *Prince George I* and chastised the district court for doing so.

■ Second, the argument is wrong as a matter of law. A federal bankruptcy court, like a federal district court, is bound to apply federal laws as they have been interpreted by the Court of Appeals in the circuit where it sits. *See, e.g., Ithaca College v. NLRB,* 623 F.2d 224, 228 (2d Cir. 1980), *cert. denied,* 449 U.S. 975, 101 S.Ct. 386, 66 L.Ed.2d 237 (1980) (stating that Second Circuit decisions become the law of the circuit and are binding upon all inferior courts). By contrast, the decisions issued by other circuits on federal questions are not binding in this circuit. *See Newsweek, Inc. v. U.S. Postal Service,* 663 F.2d 1186, 1196 (2d Cir.1981); *SEC v. Shapiro,* 494 F.2d 1301, 1306 (2d Cir.1974). In fact, this

court has recognized that "[f]ederal courts are competent to decide issues of federal law and should not be placed in the awkward position of having to apply the federal law of another circuit when it conflicts with their own circuit's interpretation." *Center Cadillac, Inc. v. Bank Leumi Trust Co.*, 808 F.Supp. 213, 224 (S.D.N.Y.1992), *aff'd*, 99 F.3d 401, 1995 WL 736336 (2d Cir.1995); *see also Menowitz v. Brown*, 991 F.2d 36, 40 (2d Cir.1993) (a federal court applies the federal law of its circuit to cases transferred from other circuits); *United States v. Allah*, 130 F.3d 33, 38 (2d Cir.1997), *cert. denied*, 524 U.S. 940, 118 S.Ct. 2347, 2348, 141 L.Ed.2d 718 (1998) (citing *United States v. Ianniello*, 808 F.2d 184, 190 (2d Cir.1986), *cert. denied*, 483 U.S.1006, 107 S.Ct. 3229, 3230, 97 L.Ed.2d 736 (1987)) ("This Court is bound by a decision of a prior panel unless and until its rationale is overruled, implicitly or expressly, by the Supreme Court or this court en banc.").

The dispute here arose in response to a claim filed against Debtors in Bankruptcy Court in the Southern District of New York. Therefore, in applying and interpreting the federal statute in question, decisions of the Second Circuit Court of Appeals are binding on the Bankruptcy Court, just as they are on this court. *See, e.g., Ithaca College, supra*, 623 F.2d at 228.

■ Montgomery County argues that, under traditional choice-of-law rules, Fourth Circuit law should apply under an "interest analysis." However, choice-of-law rules do not apply to disputes governed by federal law. *See, e.g., Sola Electric Co. v. Jefferson*, 317 U.S. 173, 176, 63

S.Ct. 172, 87 L.Ed. 165 (1942). This dispute concerns whether a particular franchise fee imposed on MFN pursuant to a county ordinance is barred by federal law. In this circuit, we apply federal law as interpreted by the Second Circuit, not elsewhere.[2]

## V. The Franchise Fee Violates § 253 of the FTA

This appeal arises out of a claim by Montgomery County for franchise fees it believes it is due pursuant to an expired franchise agreement with MFN. The County's authority to require that users of its right-of-ways obtain a franchise and pay compensation to the County has been codified in Sections 49:11–15 of the Right-of-Way Ordinance. *See* Montgomery County Code, ch. 49, §§ 49:11–15. MFN's objection to those claims was accepted by the bankruptcy court on the basis that the fees were discriminatorily applied and therefore violate the FTA. Montgomery County appeals that decision.

■ There is no dispute that when MFN initially sought to receive a franchise in Montgomery County, after completing the application process, MFN agreed to a franchise agreement with the County. That agreement required MFN to pay a monthly 5% franchise fee based on MFN's monthly earnings, which they did throughout the life of the contract. The contract expired by its own terms on June 28, 2001. The law, in the Second and Fourth Circuit alike, is that where the parties continue to do business after the expiration of a contract between them, the law implies that they doing business on the same terms and

---

**2.** Montgomery County cites a Sixth Circuit case, *TCG Detroit v. City of Dearborn*, which directly conflicts with the holding in *White Plains*. *See Dearborn*, 206 F.3d 618 (6th Cir. 2000). However, the *Dearborn* holding was specifically rejected by the Second Circuit as wrongly decided. *See White Plains*, 305 F.3d at 79–80. Under no conceivable analysis—even a conflict-of-laws "interest analysis"—would Judge Hardin have had reason to apply Sixth Circuit law.

conditions as are set forth in the expired contract. *De Young v. Buchanan*, 10 G & J 149, 32 Am. Dec. 156, 1838 WL 1377, at *5 (Md.1838); *Gostin v. Needle*, 185 Md. 634, 637, 45 A.2d 772 (Md.1946); *Baylies v. Ingram*, 84 A.D. 360, 82 N.Y.S. 891, 893 (1st Dep't 1903). Therefore, by the terms of the franchise agreement, MFN was obligated to continue paying Montgomery County a 5% franchise fee for use of its right-of-way. After the Franchise Agreement expired, MFN sought new franchises under new terms (specifically, they refused to pay a franchise fee), but no agreement was reached.

MFN claims that because the Ordinance, insofar far as it is applied to telecommunications companies, violates § 253(a) of the FTA, the fee provision contained in the now expired franchise agreement should be invalidated, and the County's claims for payment of franchise fees for the period following the Agreement's expiration should be rejected.

## A. Section 253 of the FTA

The FTA was enacted by Congress to end the "longstanding regime of state-sanctioned monopolies." *AT & T Corporation v. Iowa Utilities Board*, 525 U.S. 366, 371, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999). It "fundamentally restructure[d] local telephone markets" and barred States and local governments from passing laws that "impede competition" any longer. *Id.* Section 253 of the FTA is entitled "Removal of Barriers to Entry" and it provides in relevant part:

(a) In general. No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service.

(b) State regulatory authority. Nothing in this section shall affect the ability of a State to impose, on a competitively neutral basis and consistent with section 254 of this section, requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers.

(c) State and local government authority. Nothing in this section affects the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government.

47 U.S.C. §§ 253(a)-(c).

## B. The White Plains Test

Under § 253, all state and local regulations that prohibit or have the effect of prohibiting any company's ability to provide telecommunications services are preempted unless such regulations fall within either of the statute's two "safe harbor" provisions, §§ 253(b) and (c). *See TC Systems, Inc. v. Town of Colonie, New York*, 263 F.Supp.2d 471, 480 (N.D.N.Y. 2003). Only § 253(c) pertains to local regulation of rights-of-way and is applicable to the case at hand. *Id.* at 480–81.

In interpreting § 253 and its applicability to the 5% Franchise Fee imposed on MFN by Montgomery County, the Bankruptcy Court properly relied on the Second Circuit's opinion, *TCG New York, Inc. v. City of White Plains*, 305 F.3d 67 (2d Cir.2002), *cert. denied*, 505 U.S. 923, 123 S.Ct. 1582, 155 L.Ed.2d 314 (2003)—a case in which the Second Circuit was faced with a strikingly similar factual scenario. In *White Plains*, TCG, a new entrant to the telephone market of the City of White

Plains, challenged under the FTA § 253, *inter alia,* the City's ordinance and franchise proposal that all new entrants had to comply with, aside from the incumbent provider.

■ In *White Plains,* the Second Circuit set forth a two-part test for determining whether the ordinance and the franchise agreement violated § 253. The first step is to is to examine whether the ordinance and franchise agreement created a prohibition as defined by § 253(a), and second, if such a prohibition exists, whether such provision is protected from preemption by either § 253(b) or (c). *See White Plains,* 305 F.3d at 76–77. Thus, the appropriate methodology for resolving the present claim is to first determine whether the County's franchise process, as described in its rights-of-way ordinance, falls within the proscription of § 253(a) and then, if they do, to determine whether the fee provision of the franchise agreement, which was made pursuant to the ordinance is nevertheless permissible under section § 253(c).

### 1. Montgomery County is Effectively Prohibiting Telecommunications Services

■ Section 253(a) states that, "[n]o State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service." 47 U.S.C. § 253(a). The Second Circuit held that a prohibition does not need to be complete or "insurmountable" to run afoul of § 253(a). *See White Plains,* 305 F.3d at 76. According to the Court of Appeals, to determine whether an ordinance has the effect of prohibiting the provision of telecommunications services, a court must "consider[s] whether the ordinance materially inhibits or limits the abili-

ty of any competitor or potential competitor to compete in a fair and balanced legal and regulatory environment." *Id.* (citing *Cal. Payphone Ass'n,* 12 F.C.C.R. 14191, 1997 WL 400726, at ¶ 31 (1997)).

Montgomery County, unlike White Plains and Prince Georges County, has not passed a ordinance that specifically regulates telecommunications. Rather, it grants franchises to use its right-of-way pursuant to a law that has been on the books since 1910. That law, which simply permits the county to regulate use of county-owned rights of way, is clearly constitutional.

However, to the extent that Montgomery County regulates the use of its rights-of-way by telecommunications providers, it must do so in a manner that is consistent with the FTA—a statute that was not on the books in 1910. Section 253 of the FTA preempts *all* local statutes or regulations that "prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service." § 253(a). The question, therefore, is whether Montgomery County's regulation of its rights-of-way as applied to telecommunications companies specifically conflicts with § 253(a) of the FTA.

The first step is to determine whether or not the Ordinance has the effect of prohibiting MFN from providing telecommunication services. Appellant argues that the Bankruptcy Court never applied this part of the test, but rather "simply concluded that because the franchise fee was not imposed on Verizon, there is discrimination (under § 253(c)) . . . ." *See* Appellant's Brief at 19. Appellant is incorrect. Although the bankruptcy decision (like *White Plains* ) focuses on the application of § 253(c), Judge Hardin's decision—at footnote three—also discusses his finding that the Montgomery County Ordi-

nance has the effect of unlawfully prohibiting telecommunications in violation of § 253(a).

> [The] broad language [of the ordinance] allows the County Council to arbitrarily deny a franchise application so long as it considers that granting the application would not be "expedient and proper." Such arbitrary authority is tantamount to "a right to prohibit providing telecommunications services." *White Plains,* 305 F.3d at 76 (finding the City's right to reject any franchise application on public interest grounds that the City considered "pertinent" was equivalent to "a right to prohibit providing telecommunications services").

*In re Metromedia Fiber Network, Inc.,* 313 B.R. 153, 157, n. 3 (Bkrtcy.S.D.N.Y. 2004) (referring to § 49:12 of the Montgomery County Ordinance (providing that "absent a valid objection," the County Council "shall have authority to grant" franchises to use rights-of-way if such grant "appears to the council ... expedient and proper")). Judge Hardin's finding that portions of the Montgomery County Ordinance have the effect of prohibiting MFN from providing telecommunication services are supported in the record.

In particular, Judge Hardin detailed the lengthy application process in which MFN and all other telecommunications companies (aside from Verizon) must participate in order to receive a franchise—including negotiating franchise agreements with the County Executive representatives, a public notice period, possible public hearings, reference and recommendation by the County Executive to the County Council, additional negotiations with the County Council, a possible reference to the County's Management and Fiscal Policy Committee from the County Council, and a possible workshop open to the public where the Committee may demand additional infor-

mation and subject applicants to further negotiations on provisions of franchise agreements already approved by the County Executive, reference back to the President of the Council for further public hearings, and finally, if the full Council approves the agreements after these hearings, the applicants receive their franchises. *Id.* at 157 n. 3 (citing McDonald Aff. at ¶¶ 16–17; §§ 49:11—49:12).

Judge Hardin then properly concluded that:

> [D]uring the delay caused by this redundant and long process the Debtors are ***prohibited from providing its service*** in Montgomery County. *White Plains,* 305 F.3d at 76 ("the extensive delays in processing TCG's request for a franchise have prohibited TCG from providing service for the duration of the delays"), *see also City of Auburn v. Qwest Corporation,* 260 F.3d 1160, 1176 (9th Cir. 2001) ("regulations coupled with long approval process are a prohibition," citing *TCG New York, Inc. v. City of White Plains,* 125 F.Supp.2d 81 (S.D.N.Y. 2000)).

*Id.* at 157 (emphasis added).

Notably, the factors Judge Hardin identified as effectively prohibiting MFN from providing telecommunications service—the council's arbitrary discretion in granting franchises and the delay in the ability to provide services caused by the lengthy application process—are nearly identical to those discussed by the Second Circuit in *White Plains* as violating § 253(a). Additionally, in both the *White Plains* case and here, the incumbent telecommunications provider is uniquely exempt from the application process.

Appellant argues that *White Plains* is inapplicable because the Ordinance discussed in that case was specifically targeted at telecommunications companies, whereas the Montgomery County Code is

a general right-of-way law that covers all uses (including telecommunications). I reiterate, however, that the ordinance itself is not being challenged here—only its applicability to telecommunications providers and the Franchise Agreement made pursuant to it. The Bankruptcy Court decision does not strike down the Montgomery County Ordinance or the Maryland statute. Rather that decision found that the Ordinance violated § 253(a) only in so far as it covers telecommunication companies. And to the extent that the Montgomery County Ordinance is applicable to telecommunications companies, the facts of this case are indistinguishable from those in *White Plains*.

In *White Plains,* the Court found that because the Common Council had the right to reject any application based on any "public interest factors ... that are deemed pertinent by the City," the Ordinance violated § 253(a) by effectively prohibiting the provision of telecommunications services. *White Plains,* 305 F.3d at 76 (citing Ordinance, § 2.7–01(vii)). Similarly, the Bankruptcy Court found that § 49–12 of the Montgomery County Ordinance vests the County Council with the same arbitrary authority that is tantamount to "a right to prohibit providing telecommunications services." *See Metromedia,* 313 B.R. at 157 n. 3.

The *White Plains* decision also cited the extensive delays caused by the application process as constituting a prohibition on the provision of services during the delay (*White Plains,* 305 F.3d at 76), as did the Bankruptcy Court (*Metromedia,* 313 B.R. at 157 n. 3). Thus not only did Judge Hardin properly apply and consider the § 253(a) test, but he found the same factors that were identified in *White Plains* as effectively prohibiting the ability of TCG to provide telecommunications services, to be present in this case as well.

Furthermore, subjecting new market entrants, such as MFN, to a lengthy and discretionary application process, while exempting the incumbent provider, Verizon, from such process, has the effect of prohibiting the provision of telecommunications services, because it "materially inhibits or limits the ability" of the new entrant "to compete in a *fair and balanced* legal and regulatory environment." *See White Plains,* 305 F.3d at 76 (italics added).

In light of these obstacles that the Ordinance poses to MFN's ability to compete in Montgomery County on a fair basis, the Bankruptcy Court properly concluded that the Ordinance as applied to telecommunications companies violates § 253(a).

### 2. *The Franchise Fee is Discriminatory*

Although I agree with the bankruptcy court's finding that the Ordinance as it is being applied to the telecommunications companies violates § 253(a), I must nevertheless analyze whether the Franchise Agreement—particularly the fee portion—is saved by § 253(c). This analysis is required because applying § 253(c) to the Ordinance and Franchise Agreement "without considering individual provisions could result in an improper infringement of the [County's] legitimate interests in regulating the uses of the public rights-of-way." *White Plains,* 305 F.3d at 77.

The Bankruptcy Court properly determined that the fee provision of the franchise agreement does not fall within the savings clause of § 253(c). Section 253(c) allows "a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis...." 47 U.S.C. § 253(c). So the County is free to charge telecommunica-

tions providers for the use of its right of way. However, to fall within § 253(c)'s savings clause, the fee must meet two criteria: it is limited to "fair and reasonable compensation" and must be applied on a "competitively neutral and nondiscriminatory basis." *See* 47 U.S.C. § 253(c); *White Plains,* 305 F.3d at 77.

### a. The Franchise Fee Is Not Applied On A Competitively Neutral And Nondiscriminatory Basis

The Bankruptcy Court first examined whether the franchise fee is applied "on a competitively neutral and nondiscriminatory basis." Because Verizon—the incumbent provider of local exchange telecommunications service in Montgomery County—is exempt from paying any franchise fee, the Bankruptcy Court properly concluded that the 5% fee imposed on all other providers is not competitively neutral.

 Although "precise parity of treatment" is not required under § 253, Montgomery County may not "impose a host of compensatory provisions on one provider without placing any on another." *White Plains,* 305 F.3d at 80. Montgomery County argues that the Bankruptcy Court erred by "failing to take into consideration benefits that Verizon had conferred in the past, in exchange for its rights to operate throughout the state without the need for a local franchise." *See* Appellant's Brief at 21. However, this very argument—that the court should consider past compensation—was considered, and flatly rejected, by the Second Circuit in *White Plains. See White Plains,* 305 F.3d at 79. "[W]hether fees are competitively neutral should be determined based on future costs of providing services, not sunk costs incurred in the past, because that is the playing field on which the competition will take place." *Id.* (citing *Verizon Commu-*

*nications Inc. v. FCC,* 535 U.S. 467, 122 S.Ct. 1646, 152 L.Ed.2d 701 (2002)). Therefore, any costs incurred by Verizon in the past, are considered sunk costs and do not affect the cost to Verizon of offering services in the future, nor should they be considered. *See id.* Because MFN is required to pay a 5% Franchise Fee and Verizon is not, Verizon has an advantage competing in the marketplace and "competitive neutrality is undermined." *Id.* "[F]ees that exempt one competitor are inherently not 'competitively neutral,' regardless of how that competitor uses his resulting market advantage." *Id.* at 80. The Bankruptcy Court correctly held that the 5% Franchise Fee was not saved by § 253(c) and was in fact prohibited by the FTA.

In addition, Appellant's effort to distinguish *White Plains* on the ground that it involved a mere proposal to which TCG had not yet agreed, while MFN had agreed to the 5% fee, is unavailing. Montgomery County's decision to charge such a fee is illegal under Second Circuit law, period. MFN may at one time have agreed to pay the illegal fee but that past agreement cannot render legal an illegality that conflicts with Congress's intent. Furthermore, as appellant repeatedly points out in its brief, the "agreement" that contained the 5% fee has expired, and it is MFN's refusal to "agree" to continue paying the illegal fee that is creating the problem here. So MFN is in no different a position than was TCG in White Plains

### b. Whether 5% Fee Constitutes Fair And Reasonable Compensation Is Moot

The other issue to be considered under the *White Plains* framework is whether the 5% Franchise Fee constitutes "fair and reasonable compensation." However, I need not reach that question in light of my

determination that the Franchise Fee is not competitively neutral and nondiscriminatory. *See White Plains,* 305 F.3d. at 79 (finding it unnecessary to determine whether fee was fair and reasonable where the court found that it was applied on a discriminatory basis).

## C. Appellant's Further Arguments Are Rejected

Appellant urges that its claim can be saved because it is not trying to recover a franchise fee at all—just the value of MFN's "use and occupancy" of the right-of-way under hallowed principles of Maryland landlord-tenant law. *See* Appellant's Brief at 25–26. This, with respect, is sophistry. In its brief, appellant contends that its right to "rent" (as it calls it) from MFN as a "holdover tenant" derives from the expired franchise agreement, pursuant to which MFN placed its wires within the right-of-way. *Id.* Indeed, appellant admits that, in setting the value to which it is entitled for the use and occupancy of its right-of-way, it relies on Maryland's settled rule that "the law will imply those terms, which are found in the contract which has expired," i.e., the expired franchise agreement. *Id.* (citing *DeYoung v. Buchanan,* 10 G & J 149, 32 Am. Dec. 156, 1838 WL 1377 (Md.1838)). Because I find the franchise fee to be discriminatory and therefore invalid, it makes no difference whether plaintiff calls it a fee or rent. Either way, the County's claims to that money is rejected.

## VI. Bankruptcy Court Did Not Err In Disallowing And Expunging The County's Claims

The Bankruptcy Code defines a claim as a "right to payment." 11 U.S.C. § 101(5)(A). The Supreme Court and courts in the Second Circuit have interpreted this term to require "an enforceable obligation". *See Pennsylvania Dep't of Pub. Welfare v. Davenport,* 495 U.S. 552, 559, 110 S.Ct. 2126, 109 L.Ed.2d 588 (1990); *accord Johnson v. Home State Bank,* 501 U.S. 78, 83, 111 S.Ct. 2150, 115 L.Ed.2d 66 (1991) ("'right to payment' [means] nothing more nor less than an enforceable obligation ...."); *In re R.H. Macy & Co.,* 157 B.R. 548, 553 (S.D.N.Y. 1993) ("a 'claim' [is] a 'right to payment' ... [which] is nothing more nor less than an *enforceable obligation,* regardless of the objectives the State seeks to serve in imposing the obligation") (italics in original).

The Second Circuit explained this requirement in *LTV Steel Co. v. Shalala (In re Chateaugay Corp.),* 53 F.3d 478 (2d Cir.1995), *cert. denied, LTV Steel Co., Inc. v. Shalala,* 516 U.S. 913, 116 S.Ct. 298, 133 L.Ed.2d 204 (1995). While first recognizing the "wide scope" accorded the definition of a "claim," the Court asserted, "it is clear that the existence of a valid bankruptcy claim depends on (1) whether the claimant possessed a right to payment, and (2) whether that right arose before the filing of the petition." *Id.* at 496–97. The Court continued to state that a claim only exists where "the relationship between the debtor and the creditor contained all of the elements necessary to give rise to a legal obligation—'a right to payment'—under the relevant non-bankruptcy law." *Id.*

Similarly, in *Putnam County Sav. Bank v. Bagen (In re Bagen),* 185 B.R. 691 (Bankr.S.D.N.Y.1995), the court stated that "once an obligation is entirely unenforceable under applicable law, creditor status in bankruptcy is lost." *Id.* at 695 (*citing Davenport,* 495 U.S. at 559, 110 S.Ct. 2126); *see also G.W. White & Son v. Tripp,* No. 94 Civ. 681, 1995 WL 65058, *2, 1995 U.S. Dist. LEXIS 1887, *4 (N.D.N.Y. 1995) ("a claim against the bankrupt estate will not be allowed in a bankruptcy proceeding if the same claim would not be

enforceable against the debtor outside of bankruptcy ... [and w]hether the claim would be enforceable outside of bankruptcy is determined by looking to 'any applicable law' ").

Because I find that Montgomery County's claims were asserted in violation of the FTA and, consequently, unenforceable against the Reorganized Debtors outside of bankruptcy, it is axiomatic that these claims must be unenforceable within the context of bankruptcy. The Bankruptcy Court properly disallowed and expunged Appellant's claims.

For all of the aforesaid reasons, the decision of the bankruptcy court is AFFIRMED.

This constitutes the decision and order of the Court.